**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MONTGOMERY COUNTY** | : | **CIVIL ACTION** |
| **INTERMEDIATE UNIT NO. 23** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **K.S., By and Through His Parents,** | : | |
| **K.S. and F.S., K.S., In Their Own** | : | |
| **Right and F.S. In Their Own Right** | : | **NO. 20-2330** |

<u>**MEMORANDUM OPINION**</u>

Savage, J.                                                                              June 29, 2021

Pennsylvania does not provide free, universal preschool. The question in this case is whether it must, nevertheless, reimburse tuition for placement in a typical preschool[1] when it is necessary to provide a disabled child a free and appropriate public education ("FAPE"). The facts are not in dispute. The sole issue is a legal one – whether the *Burlington-Carter* tuition reimbursement analysis is ever appropriate to determine placement of a disabled child at a typical preschool. The answer to the question turns on whether Pennsylvania law clearly opted out of the Individuals with Disabilities Education Act's ("IDEA") requirement to provide placement for disabled children in the three-to-five age group. Only if the answer is "no" is the *Burlington-Carter* analysis applicable to determine whether parents are entitled to tuition reimbursement.

We conclude that Pennsylvania law requires tuition reimbursement for placement of a disabled child at a typical private preschool where it is necessary for the particular child to receive FAPE in the least restrictive environment ("LRE"). To hold otherwise would create two classes of disabled children – those whose parents can afford preschool

---

[1] A "typical" preschool is a preschool open to all preschool-aged children, usually at the parents' expense and consisting primarily of neurotypical children. Joint Stmt. of Undisputed Facts at ¶ 11 (ECF No. 15). There is no universal, public funding for typical preschools in Pennsylvania. *Id.* at ¶ 12.

tuition and those whose parents cannot. The latter would be left behind. Such a result could hardly have been intended.

In this case, the Pennsylvania Special Education Hearing Officer (the "Hearing Officer") decided to award tuition reimbursement and transportation for K.S.'s attendance at a typical preschool because he found the typical preschool placement was necessary for K.S. to receive FAPE. Montgomery County Intermediate Unit No. 23 ("MCIU") has appealed the decision. The parties have filed cross-motions for judgment on the administrative record. In light of Pennsylvania's adoption of the IDEA's requirements for providing FAPE to disabled preschool students, we conclude that MCIU must reimburse K.S.'s parents for the tuition they paid for K.S.'s typical preschool. We also conclude that MCIU must provide transportation for K.S. to attend his typical preschool. Therefore, we shall grant Parents' motion for judgment on the administrative record and deny MCIU's cross-motion.

## Factual Background[2]

K.S., born on January 13, 2016, is a young child diagnosed with Autism Spectrum Disorder, Mixed Receptive-Expressive Language Disorder and a sensory processing disorder.[3] He is eligible for preschool special education services under the category of "autism."[4]

---

[2] The facts recited here are from the Hearing Officer's findings of fact as recounted in the Final Decision and Order, ODR No. 22842 (Feb. 28, 2020) (ECF No. 14) ("ODR Decision"). The parties do not dispute the Hearing Officer's factual findings. *See* JSUF; Oral Arg. Tr. at 13:4-5, 15:10-13.

[3] ODR Dec. at 1, 7 ¶ 1.

[4] *Id*. at 4 ¶ 10.

K.S. received "birth to three" early intervention services from Montgomery County Department of Health and Human Services ("HHS").[5] As part of the "birth to three" program, he received speech therapy, occupational therapy, behavioral services and special instruction.[6] HHS continued to provide services to K.S. until he transitioned to services provided by MCIU when he turned three in January 2019.[7]

HHS recommended placement in a typical preschool where he would receive early intervention services.[8] It did not recommend any particular preschool.[9] In October 2018, Parents enrolled K.S. at Hearts and Hands Preschool based in part on HHS's recommendation.[10] Hearts and Hands is located an eight to fourteen minute drive from K.S.'s home.[11] Because Hearts and Hands is a typical preschool, all special education and related services K.S. received there were provided by either Parents' insurance or HHS and MCIU.[12]

---

[5] *Id*. at 2, 7 ¶ 2, 6 ¶ 23, 8 ¶ 9.

[6] *Id*. at 7 ¶ 2.

[7] *Id*. at 2, 8 ¶ 9. MCIU is one of 29 Intermediate Units ("IUs") in Pennsylvania. *See* "What is an Intermediate Unit?," MONTGOMERY COUNTY INTERMEDIATE UNIT No. 23 (2017), http://www.mciu.org/about-us/what-is-an-intermediate-unit/. IUs are regional educational agencies that serve the educational needs of a given geographic area, including supporting local school districts by providing special education services. *Id*.

[8] ODR Dec. at 7 ¶ 3.

[9] *Id*.

[10] *Id*. at 7 ¶¶ 3, 5.

[11] *Id*. at 7 ¶ 4.

[12] *Id*. at 7-8 ¶ 6. During his enrollment at Hearts and Hands, K.S. received full-day, one-to-one support from a Registered Behavior Technician supervised by a Board Certified Behavior Analyst. *Id*. at 8 ¶ 8. Both support personnel were provided through and funded by Parents' insurance. *Id*.

To prepare for the transition from HHS to MCIU in January 2019, MCIU evaluated K.S. in October 2018.[13] The evaluation identified several areas where K.S. needed support, including following directions, initiating social contact, increasing functional play, transitioning between activities and improving communication, fine motor, and coordination skills.[14]

MCIU held an Individualized Education Program ("IEP") meeting with Parents on January 7, 2019.[15] The proposed IEP contemplated special education and related services for K.S. at Hearts and Hands.[16] Parents rejected the IEP because it did not provide tuition or transportation.[17] They also disagreed with the proposed level of services.[18] Transportation to Hearts and Hands was especially important to Parents because transporting K.S. imposed substantial out-of-pocket expenses and adversely impacted their employment.[19]

The parties held another IEP meeting on February 1, 2019.[20] The proposed February IEP increased the level of services, but did not provide tuition or transportation.[21] Parents rejected the second IEP.[22]

---

[13] *Id*. at 8 ¶¶ 9-10.

[14] *Id*. at 9 ¶ 14.

[15] *Id*. at 4 ¶ 11.

[16] *Id*. at 10 ¶ 18.

[17] *Id*. at 11 ¶¶ 21-22.

[18] *Id*. at 11 ¶ 22.

[19] *Id*. at 18 ¶ 53.

[20] *Id*. at 12 ¶ 25.

[21] *Id*.

[22] *Id*. at 12 ¶ 27.

MCIU has a policy of providing transportation only to preschools designed for children with specialized needs.[23] It does not provide transportation for students to or from typical preschools unless the typical preschool is providing before or after-care for a child attending a specialized preschool.[24] MCIU was willing to provide transportation for K.S. to a specialized preschool, but not to the typical preschool he was attending.[25]

Considering specialized preschools, Parents toured Next Step Classroom in March 2019 and Friendship Academy in July 2019, two specialized preschool placements suggested by MCIU.[26] Dr. Jennifer McLaren, a certified school psychologist specializing in autism, accompanied Parents on a second visit to Friendship Academy.[27] Next Step Classroom enrolls only children with Autism Spectrum Disorder.[28] Friendship Academy has an equal mix of neurotypical and disabled children.[29]

Parents considered the Next Step Classroom and Friendship Academy inappropriate placements for K.S. because they feared the forty-five minute bus ride from his home would dysregulate him due to his sensory processing disorder.[30] They also noticed the children at the specialized preschools displayed much lower skills than K.S.,

---

[23] *Id*. at 14 ¶ 33; JSUF at ¶ 36.

[24] ODR Dec. at 14 ¶ 33.

[25] *Id*. at 14-15 ¶ 34.

[26] *Id*. at 5 ¶ 15, 14-15 ¶¶ 34-35, 16 ¶¶ 43-44.

[27] Admin. Rec. Ex. P-73 at 5 (ECF No. 14).

[28] ODR Dec. at 15 ¶ 36.

[29] *Id*. at 16-17 ¶ 45.

[30] *Id*. at 15 ¶ 37.

did not interact with one another, were non-verbal, and engaged in negative behaviors, such as hitting the teacher and pulling the teacher's hair.[31] Because K.S. tries to mimic his peers' actions, he needs positive peer role models.[32] Dr. McLaren, who shared Parents' concerns with Friendship Academy, concluded that K.S. should be in an environment with neurotypical peers so he could learn to model their behavior.[33] Parents rejected two more IEPs because they offered Next Step Classroom and Friendship Academy as the placements.[34]

On October 11, 2019, Parents filed a complaint with the Pennsylvania Office for Dispute Resolution requesting a due process hearing.[35] On October 30, 2019, the parties held a fifth IEP meeting which listed Friendship Academy as the placement.[36] Parents approved the level of behavior support, occupational therapy and physical therapy services offered in the IEP, but not the level of speech therapy.[37] They rejected the placement.[38]

## The Hearing Officer's Decision

In his decision of February 28, 2020, the Hearing Officer applied the three-step *Burlington-Carter* analysis to determine whether Parents are entitled to reimbursement

---

[31] Admin. Rec. Ex. P-73 at 5; N.T. 85-87; 4 N.T. 402-406.

[32] ODR Dec. at 15 ¶ 37; Admin. Rec. Ex. P-73 at 8.

[33] ODR Dec. at 15 ¶ 37, 16 ¶ 41, 17 ¶¶ 46, 48; Admin. Rec. Ex. P-73 at 8-9.

[34] ODR Dec. at 16 ¶ 41, 17, ¶ 48, 18, ¶ 51.

[35] *Id*. at 17 ¶ 49.

[36] *Id*. at 17 ¶ 50.

[37] *Id*. at 5-6 ¶¶ 21-22, 18 ¶ 51.

[38] *Id*. at 18 ¶ 51.

for tuition at Hearts and Hands. He considered whether: (1) the offered placement would provide K.S. FAPE; (2) Parents' placement choice was appropriate for K.S. to receive FAPE; and (3) equitable considerations merited a reduction or elimination of a reimbursement award.[39] *Burlington Sch. Comm. v. Dep't of Educ. of Massachusetts*, 471 U.S. 359 (1985); *Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993).

The Hearing Officer concluded that MCIU's most recent placement offer at Friendship Academy was not appropriate for K.S.[40] He found that MCIU's own evaluation supported K.S.'s placement in a typical preschool.[41] Nothing in any of the evaluations concluded that K.S. required a specialized preschool to receive FAPE.[42] Rather, the Hearing Officer concluded that MCIU offered the placement because: (1) it could acquiesce to Parents' demand for transportation without violating its policy; (2) the preschool serves children with K.S.'s diagnosis; and (3) Parents had rejected Next Step Classroom.[43] In short, he found that MCIU offered placement at Friendship Academy based on administrative convenience, not K.S.'s unique needs.[44]

---

[39] *Id*. at 22.

[40] *Id*. at 27. The *Burlington-Carter* analysis requires MCIU to offer a placement providing FAPE within ten days of Parents' notice of intent to seek tuition reimbursement. *Id*. at 25. Parents' only written demand for tuition reimbursement came in their due process complaint on October 11, 2019. *Id*. at 25-26. The Hearing Officer therefore examined MCIU's last offer before October 21, 2019, which was Friendship Academy. *Id*. at 26.

[41] *Id*. at 27.

[42] *Id*.

[43] *Id*.

[44] *Id*. at 28.

On the other hand, the Hearing Officer determined that Parents' choice of placement at Hearts and Hands was appropriate.[45] He noted that Hearts and Hands, without MCIU's speech therapy, occupational therapy, special instruction, physical therapy and behavioral services to K.S., was not appropriate.[46] However, he reasoned that Parents' placement choice was based on considering Hearts and Hands together with MCIU's special education and related services.[47] The Hearing Officer noted that MCIU conceded that Hearts and Hands was an appropriate placement when it offered to provide services to K.S. in that setting at the first IEP meeting.[48] MCIU only objected to paying tuition.

The Hearing Officer concluded that there were no equitable considerations warranting a reduction or elimination of tuition reimbursement.[49] Parents were consistent in explaining in writing what they wanted and why.[50] They visited both placements MCIU suggested.[51] They consented to each evaluation MCIU proposed and they otherwise cooperated with MCIU's efforts to gather information about K.S.[52] He decided that

---

[45] *Id*. at 29.

[46] *Id*. at 28-29.

[47] *Id*. at 29.

[48] *Id*.

[49] *Id*.

[50] *Id*. at 29.

[51] *Id*.

[52] *Id*. at 30.

Parents were entitled to tuition reimbursement for K.S.'s attendance at Hearts and Hands from October 21, 2019 through the end of the 2019-2020 school year.[53]

The Hearing Officer agreed with Parents that MCIU was obligated to make an individualized determination whether transportation was necessary as a related service for K.S. to receive FAPE.[54] The parties agreed no such individualized determination was made.[55] MCIU argued that the IDEA defers to state law on questions of early intervention transportation, and Pennsylvania's early intervention law does not require it to transport students to typical preschools.[56] MCIU also argued that Pennsylvania custom and practice establishes that early intervention providers do not transport students to typical preschools.[57]

The Hearing Officer held that the omission of transportation from the list of services that Pennsylvania early intervention agencies must provide does not excuse them from adhering to the affirmative IDEA mandate listing transportation as a related service.[58] He noted that there is a Pennsylvania custom and practice against transporting students to typical preschools, but it is "not controlling."[59] He concluded the evidence established that transportation was necessary for K.S. to receive FAPE.[60] Because of the burden on

---

[53] *Id.*

[54] *Id.* at 30-31.

[55] *Id.* at 30.

[56] *Id.*

[57] *Id.* at 31.

[58] *Id.* at 30-31.

[59] *Id.* at 31.

[60] *Id.*

Parents to transport K.S. to school, the education he received at Hearts and Hands was not "free."[61] He held that K.S. was entitled to transportation as a related service under the unique facts of this case.[62]

## Parties' Arguments

### *Parents' Motion for Judgment on the Administrative Record*

Parents argue that the Hearing Officer correctly applied the *Burlington-Carter* analysis for reimbursements for tuition and related services.[63] They explain that the IDEA's statutory scheme requires a local educational agency ("LEA")[64] to provide FAPE as well as appropriate related services in the LRE for the student.[65] When an LEA fails to meet those obligations, Parents argue, reimbursement is the primary remedy to compensate parents for their out-of-pocket expenses in providing their child with FAPE.[66] The hearing officer has the discretion to award this equitable remedy when the facts warrant it.[67]

---

[61] *Id.* at 31-32.

[62] *Id.* at 32.

[63] Defs.' Memo. in Supp. of Mot. for J. on Admin. Rec. at 10-11 (ECF No. 17).

[64] The IDEA defines "local educational agency" as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19)(a). In other words, an LEA is the equivalent of a school district for purposes of this opinion.

[65] Defs.' Memo. in Supp. at 12.

[66] *Id.*

[67] *Id.* at 11.

Parents contend the fact that LEAs do not ordinarily provide tuition and transportation to typical preschools in Pennsylvania is not dispositive, noting that hearing officers and courts often award equitable remedies beyond the normal parameters for IDEA eligibility.[68] Similarly, that Pennsylvania does not provide universal public preschool is not dispositive because courts have held that the LRE requirement is not limited by what programs an LEA offers.[69] They contend that Pennsylvania special education hearing officers, as well as Pennsylvania courts, have held that LEAs are not obligated to fund typical preschool settings for all disabled children, but they may be obligated to do so when it is necessary for an individual to receive FAPE.[70]

Parents argue that Pennsylvania has adopted the IDEA provisions on evaluations, IEPs and early intervention services, including the FAPE and LRE requirements, and the provisions in 34 C.F.R. § 300.148 governing the reimbursement of tuition for private school enrollment.[71] They contend there is no state bar to payment for tuition at a typical preschool for eligible students.[72] They claim Pennsylvania's Early Intervention Services System Act ("EISSA"), Pennsylvania's Administrative Code and Pennsylvania Department of Education ("PDE") guidance documents demonstrate that an LEA may be obligated to pay for tuition at a typical preschool if it is necessary for the child to receive FAPE in the LRE.[73]

---

[68] *Id*. at 11-12.

[69] *Id*. at 18-19.

[70] Defs.' Resp. in Opp. to Pl.'s Mot. for J. on Admin. Rec. at 6-8 (ECF No. 18).

[71] Defs.' Memo. in Supp. at 13-14; Defs.' Resp. at 3.

[72] Defs.' Memo. in Supp. at 13.

[73] *Id*. at 16; Defs.' Resp. at 3.

Parents emphasize that the Hearing Officer found that K.S.'s needs and IEP goals necessitated a typical preschool.[74] Because MCIU refused to consider this placement for K.S., Parents contend, it denied him FAPE in the LRE.[75] Parents emphasize that MCIU has not appealed the Hearing Officer's factual findings that it offered placement at Friendship Academy for administrative convenience, it failed to evaluate K.S.'s needs before choosing to segregate him from his neurotypical peers, and it failed to find a placement in the LRE.[76]

Parents also argue that the Hearing Officer appropriately ordered MCIU to provide transportation under the unique facts of this case.[77] They state that it is undisputed that transportation is a related service under the IDEA and the right to FAPE includes related services.[78] Though the EISSA's list of related services does not include transportation, they contend, the EISSA explicitly expresses that its list is not exhaustive.[79] To show that MCIU is obligated to provide transportation under Pennsylvania law, they cite 24 P.S. § 13-1374, which requires Intermediate Units ("IUs") to provide transportation for children with disabilities when they are unable to attend the class or center for which they are qualified.[80]

---

[74] Defs.' Memo. in Supp. at 17, 19.

[75] *Id*. at 16-17.

[76] Defs.' Resp. at 4.

[77] Defs.' Memo. in Supp. at 19, 22.

[78] *Id*. at 19; Defs.' Resp. at 9.

[79] Defs.' Resp. at 9.

[80] *Id*.

Parents contend that transportation is necessary to meet K.S.'s IEP goals and to provide FAPE.[81] They argue that there is no *statewide* practice against early intervention agencies providing transportation to typical preschools.[82] According to Parents, only statewide practices or customs can establish a policy against transporting students to typical preschools, and MCIU has not shown the existence of a statewide practice.[83]

*MCIU's Motion for Judgment on the Administrative Record*

MCIU, relying on the exception in 20 U.S.C. § 1412 allowing states to opt out from providing preschool children FAPE, argues it has no obligation to fund K.S.'s placement at Hearts and Hands.[84] According to MCIU, Pennsylvania has chosen to provide fewer protections or services for preschoolers.[85] It claims that just as LEAs are not obligated to fund preschool for neurotypical children in Pennsylvania, they are not required to fund typical preschool placements for children with disabilities.[86]

MCIU contends the Hearing Officer improperly ignored Section 1412's exception and erred in applying the *Burlington-Carter* reimbursement framework because Parents were never entitled to a tuition reimbursement in the first place.[87] MCIU cites several decisions from Pennsylvania special education hearing officers holding that LEAs in

---

[81] Defs.' Memo. in Supp. at 19-20.

[82] *Id.* at 20-21.

[83] Defs.' Resp. at 10-11.

[84] Pl.'s Memo. in Supp. of Mot. for J. on Admin. Rec. at 4-5 (ECF No. 16).

[85] *Id.* at 5-6.

[86] *Id.* at 6.

[87] *Id.* at 9-10; Pl.'s Resp. in Opp. to Defs.' Mot. for J. on Admin. Rec. at 2 (ECF No. 19). MCIU conceded at oral argument that assuming the *Burlington-Carter* standard applied in the first place, the Hearing Officer applied it correctly. Oral Arg. Tr. at 53:5-24.

Pennsylvania do not have a duty to fund a typical preschool environment, only early intervention services which can be administered in a variety of settings.[88] According to MCIU, there is no legal authority for the proposition that a hearing officer can award tuition reimbursement for a typical preschool.[89] It claims the guidance documents Parents rely upon do not have the force of law.[90]

MCIU argues that FAPE and the LRE are two distinct concepts.[91] FAPE refers to programs and services, whereas the LRE is the setting common to all learners of the same age and grade level.[92] MCIU acknowledges that it is obligated to provide specialized services to K.S. at his placement, but disputes that it must fund the placement itself.[93] Even if Hearts and Hands is the LRE, MCIU argues, it does not alter the current state of Pennsylvania law, which imposes no statutory obligation to pay for the placement.[94]

MCIU also argues that Pennsylvania state law and practice impose no obligation to provide transportation to typical preschools as part of FAPE.[95] The EISSA defines what

---

[88] Pl.'s Memo. in Supp. at 6-7, 9-10; Pl.'s Resp. at 3-4. Parents distinguish MCIU's hearing officer decisions on the grounds that the officers concluded in those cases, unlike here, that the children did not require a typical preschool placement to receive FAPE. Defs.' Resp. at 6-7. They claim MCIU mischaracterizes those decisions as uniformly prohibiting preschool tuition reimbursement in the appropriate case. *Id*. at 8.

[89] Pl.'s Resp. at 2-3.

[90] *Id*. at 4.

[91] Pl.'s Memo. in Supp. at 7-8.

[92] *Id*. at 7-8.

[93] *Id*. at 9.

[94] *Id*. at 8.

[95] *Id*. at 11.

is included in early intervention services, and it noticeably does not list transportation as one of them.[96] MCIU emphasizes that the exception in Section 1412 focuses on what state law requires, not what it prohibits.[97] MCIU claims that Parents overstate the importance of Section 13-1374 of Purdon's Pennsylvania Statutes because MCIU need only provide services, not placement, and the class and center is not one for which K.S. is qualified by way of early intervention services.[98] It also claims that state practice does not provide transportation for children with disabilities attending typical preschools even if they receive services there, and there was no evidence presented to the contrary.[99] MCIU contends the Hearing Officer erred by reading an additional requirement to provide transportation into the Pennsylvania statutes and finding the Pennsylvania practice against providing transportation to typical preschools was not controlling.[100] MCIU adds that if we affirm the Hearing Officer's decision to award tuition and find that transportation is required because of the tuition reimbursement, we should reverse the Hearing Officer's decision to order transportation on a broader scale and limit the Hearing Officer's legal conclusion to the facts of this case.[101]

---

[96] *Id.*; Pl.'s Resp. at 5-6.

[97] Pl.'s Memo. in Supp. at 11.

[98] Pl.'s Resp. at 5.

[99] *Id.* at 6.

[100] Pl.'s Memo. in Supp. at 12-13.

[101] *Id.* at 13-14. The Hearing Officer did not order transportation on a broad scale. He held "[t]he Student is entitled to a free appropriate public education and so, *under the unique facts of this case*, the Student is entitled to transportation as a related service." ODR Dec. at 32 (emphasis added). He ordered that "[g]oing forward, MCIU may, at its discretion, either continue to reimburse the Parents for transportation purchased by the Parents or provide its own transportation through the end of 2019-2020 school year." *Id.* at 34.

**Standard of Review**

The district court conducts a "modified de novo" review of a special education hearing officer's decision. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citations omitted); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). The district court must give "due weight" and deference to administrative factual findings which are deemed *prima facie* correct. *D.S.*, 602 F.3d at 564; *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009). The court may not substitute its "own notions of sound educational policy for those of the school authorities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 1001 (2017) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)). The court must defer to the findings of those with educational expertise.

**Analysis**

*The IDEA's Standards*

The IDEA requires states to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Section 1401(9) of the IDEA defines "free appropriate public education" as "special education and related services" that:

> (1) have been provided at public expense, under public supervision and direction, and without charge; (2) meet the standards of the State educational agency; (3) include an appropriate *preschool*, elementary school, or secondary school education in the State involved; and (4) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9) (emphasis added).

To receive financial assistance under the IDEA, a state must provide FAPE "to all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). This means the state must provide an education that confers a

"meaningful benefit" to each child with a disability. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (citing *D.S.*, 602 F.3d at 556). The benefit must be substantial, not minimal. *Endrew F.*, 137 S. Ct. at 1001. To achieve a meaningful benefit, the LEA must fashion an IEP uniquely tailored for the child. *Id.* at 991 (citing 20 U.S.C. §§ 1401(9)(D), 1412(a)(1)). The IEP is the roadmap for the child's educational progress. It must be reasonably calculated to enable the child to make appropriate progress "in light of the child's circumstances." *Id.* at 999. It must "set out a plan for pursuing academic and functional advancement." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV)).

The core of the IDEA is the collaborative process among the parents and the school officials to fashion the IEP. *Id.* at 994 (citing 20 U.S.C. § 1414). This collaboration among the parents and the educators ensures careful consideration of the child's individual circumstances. *Id.*

In developing the IEP, an LEA is not required to provide a specific program or employ a specific methodology requested by the parent. *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 813-14 (E.D. Pa. 2011) (citations omitted). Although an LEA is required to provide FAPE to a disabled child, it is not required to provide the *best* possible education to maximize educational benefits. *See Rowley*, 458 U.S. at 199 (explaining that the IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential"); *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 178 (3d Cir. 1988). Nor is an LEA required to provide each disabled child with opportunities substantially equal to those afforded to children without disabilities. *Endrew F.*, 137 S. Ct. at 1001 (citing *Rowley*, 458 U.S. at 198).

The IDEA dictates that children with disabilities must be educated in the "least restrictive environment." It provides:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The Third Circuit has interpreted the LRE requirement to mandate that "a disabled child be placed in the least restrictive environment that will provide a 'meaningful educational benefit.'" *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). "To that end, disabled children shall be, 'to the greatest extent possible, satisfactorily educate[d] . . . together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled.'" *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (quoting *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995)). *See also* 34 C.F.R. § 300.116(c), (e) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled . . . . A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum."). The LRE requirement applies equally to the placement of preschool children. *Kingwood*, 205 F.3d at 579-80 (quoting 34 C.F.R. § 300.552) ("Of course, a district that does not operate a regular preschool program is not required to initiate one simply in order to create an LRE opportunity for a disabled child. However, the school district is required to take into account a continuum of possible alternative placement options when formulating an IEP, including '[p]lacing children with

disabilities in private school programs for nondisabled preschool children.'"). *See also L.G. ex rel. E.G. v. Fair Lawn Bd. of Educ.*, 486 F. App'x 967, 973 (3d Cir. 2012) (citations omitted).

When an LEA fails to provide FAPE and the parents enroll the student in an appropriate private school, the LEA must reimburse the parents for the private school tuition. *Ramsey*, 435 F.3d at 389-90 (citations omitted). The pertinent regulation provides that: "If the parents of a child with a disability . . . enroll the child in a private *preschool*, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate." 34 C.F.R. § 300.148(c).

The Supreme Court has articulated a three-step analysis to determine whether parents are entitled to tuition reimbursement under the IDEA. *See Burlington*, 471 U.S. at 369-70, 373-4; *Carter*, 510 U.S. at 12-16. Under the *Burlington-Carter* analysis, the court must determine whether: (1) the LEA's proposed IEP constituted an offer of FAPE; (2) the private school placement was appropriate; and (3) equitable considerations weigh for or against reimbursement.

*The Section 1412 Exception*

Although the IDEA envisions FAPE for all children with disabilities between the ages of three and 21, states are not obliged to offer FAPE for children "aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice." 20 U.S.C. § 1412(a)(1)(B)(i). In other words, by

legislation or practice, states may opt out of providing FAPE to children in those age groups without jeopardizing federal funding.

The Third Circuit has interpreted this exception as requiring states to provide an educational benefit to children with disabilities in these age groups only if the same benefit is available to children without disabilities in the same age group. *See Wexler v. Westfield Bd. of Educ.*, 784 F.2d 176, 183 (3d Cir. 1986) (citing *Helms v. Indep. Sch. Dist. No. 3 of Broken Arrow, Tulsa Cnty., Okl.*, 750 F.2d 820, 823 (10th Cir. 1984)).[102] The First, Sixth, Seventh and Ninth Circuits have held this section means that if public agencies provide education to non-disabled children in these age groups, they must make FAPE available to at least a proportionate number of disabled children of the same age. *K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 642 (1st Cir. 2018); *O'Donniley v. Metro. Pub. Sch.*, 919 F.2d 141 (6th Cir. 1990); *Timms on Behalf of Timms v. Metro. Sch. Dist. of Wabash Cty., Ind.*, 722 F.2d 1310, 1314 (7th Cir. 1983); *E.R.K. ex rel. R.K. v. Hawaii Dep't of Educ.*, 728 F.3d 982, 987 (9th Cir. 2013). In short, the state must provide disabled children the same benefits it provides to non-disabled children in the same age group.[103]

---

[102] The regulations the court relied upon have since changed. The 1984 version of 34 C.F.R. § 300.300(b)(2) stated: "[i]f a public agency provides education to non-handicapped children in any of these age groups, it must make a free appropriate public education available to at least a proportionate number of handicapped children of the same age." The current version of this regulation, codified in 34 C.F.R. § 300.102(a)(1), does not contain this language. However, courts in other circuits continue to interpret Section 1412 as requiring the state to make the same benefits available to disabled children as non-disabled children. *See K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 642 (1st Cir. 2018); *E.R.K. ex rel. R.K. v. Hawaii Dep't of Educ.*, 728 F.3d 982, 987 (9th Cir. 2013); *R.P.-K. v. Dep't of Educ., Hawaii*, 817 F. Supp. 2d 1182, 1193 (D. Haw. 2011); *A.R. v. Connecticut State Bd. of Educ.*, No. 16-1197, 2020 WL 3086032, at *4 (D. Conn. June 10, 2020).

[103] The legislative history supports this conclusion. The Senate Report accompanying the 1975 version of the IDEA explains that states must provide special education to children with disabilities aged three-to-five and 18-to-21 if they provide public education to non-disabled children in those age groups. *See* S. Rep. No. 94–168, at 19 (1975).

Despite the opt-out provision in Section 1412, there is nothing in the IDEA prohibiting a state from providing a benefit to children with disabilities that it does not make available to children without disabilities. Although Pennsylvania can elect not to provide preschool to children with disabilities as long as it does not provide preschool to children without disabilities, it can still choose to provide preschool to children with disabilities and not to children without disabilities. In fact, Pennsylvania LEAs often choose to do so. It is undisputed that Pennsylvania LEAs may offer specialized preschools to disabled children even though they do not offer universal, public preschool to neurotypical children. Consistent with its own practice and the practice of other LEAs, MCIU offered K.S. placement at Friendship Academy and Next Step Classroom, specialized preschools.[104]

Parents contend that LEAs are obligated to provide typical preschool for children with disabilities when necessary for them to receive FAPE. MCIU counters that Pennsylvania law mandates only services and not placement in a typical preschool. Parents argue Pennsylvania law has fully adopted the IDEA standards which require funding for typical preschool for children with disabilities when it is necessary to provide FAPE.

To determine whether MCIU is obligated to provide tuition for placement of a disabled child in a typical preschool, we shall review the EISSA, the Pennsylvania

---

[104] At oral argument, MCIU's counsel testified:
   "Q: As I gather, MCIU will pay for transportation of a disabled child to a specialized preschool, correct?
   A: Yes.
   Q: Why is that?
   A: Because – the short answer is because they're funding the preschool. They are providing . . . . the placement and the service. If the student is placed at a specialized placement, the IU is providing that placement."
Oral Arg. Tr. at 54:4-17.

Administrative Code adopting the Code of Federal Regulations, and the PDE guidance documents. We look to see whether Pennsylvania has clearly opted out of providing FAPE to children in the three-to-five age group.

*Tuition Reimbursement*

The Third Circuit has not addressed what states must do to opt out of providing FAPE to the three-to-five and 18-to-21 age groups. Nor has any other circuit. A district court in Hawaii has held that Section 1412 requires a clear state law to exclude these age groups from the FAPE requirement. *See B.T. ex rel. Mary T. v. Dep't of Educ., State of Hawaii*, 637 F. Supp. 2d 856, 863 (D. Haw. 2009) ("The State is only allowed to deviate from the requirements of the IDEA if there is a clear State law that says otherwise"); *see also St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 169 (2d Cir. 2001) (finding a New York statute providing only "person[s] over five and under twenty-one years of age" are eligible to receive a public education was sufficient to deviate from the IDEA standards under the exception).

Pennsylvania law does not expressly except providing FAPE to the three-to-five age group. Nor is it clear that it has opted out of providing it. Because Pennsylvania does not provide universal preschool for children without disabilities, one could conclude that it need not provide it for children with disabilities. But, although the relevant statutes and regulations do not clearly define what obligations an LEA has with respect to providing preschool for disabled children, they suggest that an LEA, in certain circumstances, has an obligation to provide placement of a disabled child in a typical preschool when necessary to provide FAPE in the LRE.

The EISSA established a statewide system of programs to provide appropriate "early intervention services" to infants, toddlers and eligible young children. 11 P.S. § 875-301.[105] "Early intervention services" are developmental services provided in the least restrictive environment appropriate to the child's needs. 11 P.S. § 875-103. Section 875-103 defines "early intervention services" as developmental services that are provided in compliance with Part B of the IDEA[106] "as it applies to preschool children." *Id*. Part B of the IDEA provides for FAPE for all students between the ages of three and 21, inclusive.[107] The EISSA does not list any carve-outs or exceptions from Part B.

The EISSA is about providing early intervention *services*. Although it discusses the underlying placement in reference to the LRE requirement, it does not mention anything about tuition or the costs of the underlying placement. Nonetheless, it contemplates providing those services to disabled children in a preschool, including a typical one if that school is the LRE. It requires that "children who will be served in a non-home-based setting must, to the maximum extent consistent with the child's abilities, receive early intervention services in a setting with nonhandicapped children." *Id*.

---

[105] As a three-year-old child with autism, K.S. qualifies as an "eligible young child" under EISSA. 11 P.S. § 875-103 (defining "eligible young child" as a child between three years of age and the minimum age established by the school district for admission to first grade with a disability and developmental delay, including autism).

[106] Part A of IDEA sets the foundation for the act, including defining key terms and outlining the act's purpose. 20 U.S.C. § 1400 *et seq.* Part B covers education for children with disabilities from ages three to 21. 20 U.S.C. § 1411 *et seq.* Part C addresses education for children from birth to age three. 20 U.S.C. § 1431 *et seq.* This case implicates only Part B.

[107] Part B ensures that all children with disabilities receive FAPE that emphasizes "special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). "Special education" is defined as specially designed instruction to meet the unique needs of a child with a disability. 20 U.S.C. § 1401(29). "Related services" is defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

Although the EISSA recognizes the importance of immersion with neurotypical children when providing services to disabled preschool children, it does not answer the question of whether tuition reimbursement is available for typical preschool placements. Yet, the EISSA does not preclude reimbursement for private preschool tuition when necessary to provide FAPE.

To satisfy the IDEA requirements, the Pennsylvania Administrative Code adopted the federal regulations codified in 34 C.F.R. Part 300 in its entirety. *See* 22 Pa. Code § 14.102(a)(1). Section 14.102 specifically adopts C.F.R. § 300.148 relating to parents' placement of children in private schools when FAPE is at issue. 22 Pa. Code § 14.102(a)(2)(xvi). Although 20 U.S.C. § 1412(a)(10)(C), the IDEA section authorizing C.F.R. § 300.148, only lists "private elementary school or secondary school" as placements for which tuition reimbursement may be available, C.F.R. § 300.148 specifically provides for tuition reimbursement for all levels of school, including preschool. *See* 34 C.F.R. § 300.148(c).

When it adopted C.F.R. Part 300, the Administrative Code invoked one of the exceptions available in C.F.R. § 300.102(a)(2), which are modeled after Section 1412. It excludes from FAPE incarcerated children aged 18 through 21. *See* 22 Pa. Code § 14.102(a)(2)(x); Pennsylvania Department of Education, "Policies and Procedures Under 34 CFR §§ 300.101-300.176" at 3 (July 1, 2018), https://www.education.pa.gov/ Documents/K-12/Special%20Education/IDEIA-IDEA/IDEA-B%20Policies%20and%20 Procedures%202018.pdf ("PDE Policies and Procedures").[108] There is no exception for

---

[108] The PDE Policies and Procedures state:
As described under § 300.102, there are no exceptions for age range [*sic*] of 3 through 21, unless the following exist: It is PDE policy with respect to children aged 18 through 21 that FAPE is not required for students with disabilities who, in the last educational placement

preschool students, ages three-to-five. *See* 22 Pa. Code § 14.102(a)(2)(x); PDE Policies and Procedures at 3, § 300.102.

Pennsylvania's decision to except older incarcerated children from FAPE as provided in § 300.102(a)(2) suggests Pennsylvania, knowing how to opt out, did not choose to preclude children in the three-to-five age group from FAPE. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (the canon *expressio unius est exclusio alterius* applies "when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice"); *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) (quoting *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002)) ("Under the doctrine of *expressio unius est exclusio alterius*, 'the inclusion of a specific matter in a statute implies the exclusion of other matters.'"); *see also Kmonk-Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001) ("[A]lthough one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say.") (citations omitted).[109] Reading the Administrative Code together with C.F.R. Part 300, which it adopted, leads to the conclusion that Pennsylvania deliberately did not preclude placement and tuition reimbursement in typical preschools for disabled students.

The Administrative Code also incorporates the LRE requirements. Chapter 14 of the Administrative Code is dedicated to Special Education Services and Programs. It

---

prior to their incarceration in an adult correctional facility were not determined eligible for special education and related services and did not have an IEP.
PDE Policies and Procedures at 3-4, § 300.102.

[109] The Third Circuit has used rules of statutory construction to interpret regulations. *See, e.g.*, *Acceptance Ins. Co. v. Sloan*, 263 F.3d 278, 283 (3d Cir. 2001) (citations omitted); *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 351 (3d Cir. 2007) (citations omitted); *Sekula v. F.D.I.C.*, 39 F.3d 448, 453 (3d Cir. 1994).

adopts C.F.R. § 300.116, which includes placing preschool children with disabilities in the LRE, in its entirety. 22 Pa. Code § 14.102(a)(2)(xiii); 34 C.F.R. § 300.116(a)(2). The provisions relevant to this case are grouped under the "Educational Placement" and "Early Intervention" headings. The "Educational Placement" section includes four sub-sections, one of which covers the LRE requirements. 22 Pa. Code § 14.143 *et seq*. The LRE sub-section provides that each school entity[110] shall ensure that "[t]o the maximum extent appropriate, and as provided in the IEP, the student with a disability is educated with nondisabled peers." 22 Pa. Code § 14.145(1). LEAs are also required "to provide access to a full continuum of placement options." 22 Pa. Code § 14.145(5). Significantly, "[a] student may not be removed from or determined to be ineligible for placement in a regular education classroom . . . solely because educating the student in the regular education classroom would necessitate additional cost or for administrative convenience." 22 Pa. Code § 14.145(4). Though these sub-sections are codified under "Educational Placement," a distinct heading from "Early Intervention," and they do not discuss preschool or early intervention programs, there is nothing in the Administrative Code suggesting that these sub-sections are limited to school-age children.

The "Early Intervention" section includes a sub-section titled "Range of Services." 22 Pa. Code § 14.155. This sub-section addresses the services available to meet the needs of children eligible for early intervention. Section 14.155 provides that "options may be made available directly by early intervention agencies or through contractual arrangements for services and programs with other agencies in the community, including

---

[110] "School entity" is defined as "[a] local public education provider such as a school district, area vocational-technical school or intermediate unit but excluding charter schools and cyber charter schools under Article XVII-A of the School Code." 22 Pa. Code § 14.101.

preschools[.]" 22 Pa. Code § 14.155(a).[111] This regulation reiterates that the LRE requirements apply to early intervention programs: "The IEP team shall recommend early intervention services to be provided in the least restrictive environment with appropriate and necessary supplementary aids and services." 22 Pa. Code § 14.155(b). It states that "[t]he placement options may include one or more of the following": "early childhood environment," defined as "[s]ervices provided in a typical preschool program with noneligible young children," and "early childhood special education environment," defined as "[s]ervices provided in a special education preschool program funded by the early intervention agency." 22 Pa. Code § 14.155(b)(1)-(2). Section 14.155 does not explicitly address whether an LEA must fund a typical preschool as part of the early intervention program. *Id*.

None of the Pennsylvania statutes or regulations address paying tuition or the costs of the underlying placement in a typical preschool. They neither specifically authorize nor prohibit it. In the absence of clear language to the contrary, the IDEA's obligation to provide FAPE for children aged three-to-five applies.

Unlike the statutes and regulations, the PDE's policy documents are clear, leaving no doubt that disabled children from three-to-five are entitled to FAPE. In July 2018, in compliance with C.F.R. Part 300, the PDE released its "Model Local Educational Agency (LEA) Policies and Procedures."[112] Citing the Administrative Code as authority for each section of its Policies and Procedures, the PDE proclaims that Pennsylvania "ensures

---

[111] Although the Administrative Code does not define the term "programs," the context of the statute suggests that the term includes educational placement. *See*, *e.g.*, 22 Pa. Code § 14.155(b)(1)-(2) (referring to services provided in a "typical preschool program" and a "special education preschool program").

[112] Defs.' Resp. Ex. A at 1-2.

that all children with disabilities aged 3 years to 21 years of age residing in PA have the right to a free appropriate public education[.]" PDE Policies and Procedures at 2, § 300.101. The PDE emphasized that, as a matter of PDE policy, "a free appropriate public education is available to all children residing in the State between the ages of 3 and 21 . . . FAPE is made available to each eligible child residing in the State beginning no later than the child's third birthday." *Id*.

As does the Administrative Code, the PDE Policies and Procedures make one exception to FAPE for children between the ages of three and 21. They except incarcerated children 18 through 21. *Id*. at 3-4, § 300.102. There is no exception for children ages three-to-five. They also incorporate C.F.R. §§ 300.116 and 300.148(c), which specifically apply to preschool children. *Id*. at 13-14, § 300.116; *id*. at 32, § 300.148(c).

The PDE Policies and Procedures explicitly allow for a court or hearing officer to award tuition reimbursement for regular preschool if the placement is necessary to provide the child FAPE:

> If the parents of a child with a disability . . . enroll the child in a private *preschool*, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child . . . and that the private placement is appropriate.

*Id.* at 32, § 300.148 (emphasis added).

This directive is clear. The LEA is responsible for providing a disabled child a preschool placement if it is necessary to provide FAPE. The PDE Policies and Procedures do not distinguish between specialized and typical preschools. Moreover, LEAs cannot

deny a disabled child the LRE in a typical preschool for administrative convenience or a desire to avoid additional costs:

> It is PDE's policy that in determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency shall ensure that the placement decision . . . is made in conformity with the LRE provisions of this section . . . . A child with a disability is not removed from education in *age-appropriate regular classrooms* . . . solely because educating the student in the regular education classroom would *necessitate additional cost or for administrative convenience*.

*Id*. at 13, § 300.116 (emphasis added). In sum, the PDE's policies and procedures require an LEA to fund a typical preschool placement if it is appropriate and necessary for the child to receive FAPE.

The federal guidelines reinforce this notion. The U.S. Department of Education Office of Special Education and Rehabilitation Services issued a policy document providing information on special education and related services, including those for preschool children. This policy document supports the availability of tuition reimbursement for a private preschool when it is necessary for the disabled child to receive FAPE and the LEA does not provide public preschool:

> Public agencies that do not have an inclusive public preschool that can provide all the appropriate services and supports must explore alternative methods to ensure that the LRE requirements are met. Examples of such alternative methods might include placement options in private preschool programs or other community-based settings. Paying for the placement of qualified preschool children with disabilities in a private preschool with children without disabilities is one, but not the only, option available to public agencies to meet the LRE requirements. . . . However, if a public agency determines that placement in a private preschool program is necessary as a means of providing special education and related services to a child with a disability, the program must be at no cost to the parent of the child.

"Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities," 71 FR 46540-01 (Aug. 14, 2006).

Having examined the federal and Pennsylvania statutes, regulations, and the PDE policy documents, we conclude that Pennsylvania law has not opted out of providing funding for a typical preschool if it is necessary for the disabled child to receive FAPE in the LRE. The relevant statutes and regulations do not clearly and unequivocally opt out of providing FAPE for disabled children in the three-to-five age group. On the other hand, the PDE policy documents clearly provide that paying for a disabled child's placement in a typical preschool may be appropriate to meet the LRE requirements. Having adopted the IDEA and regulations in their entirety and not having opted out of the three-to-five age group, Pennsylvania allows for placement in a typical preschool where necessary to provide FAPE in the LRE.

There is a dearth of case law in the Third Circuit and Pennsylvania discussing Section 1412's exception in the tuition reimbursement context and Pennsylvania's obligations to provide typical preschool to students with disabilities. There are a number of cases where federal courts have applied the *Burlington-Carter* analysis in situations where the dispute was between two different specialized preschools. *See*, *e.g.*, *Rose v. Chester County Intermediate Unit*, No. 95-239, 1996 WL 238699, at *1 (E.D. Pa. May 7, 1996).[113] There are none addressing tuition reimbursement for a typical preschool placement.

The only Pennsylvania court to address tuition reimbursement for typical preschool is *Delaware County Intermediate Unit v. Jonathan S.*, 809 A.2d 1051 (Pa. Commw. 2002).

---

[113] We note that these courts would not have applied the *Burlington-Carter* standard in their analyses if tuition reimbursement for preschool, albeit specialized preschool, was never an option in the first place.

That case did not hold that there is never an obligation to provide placement of a disabled child in a typical preschool.

In *Jonathan S.*, the parents requested funding for a typical preschool for their child who was diagnosed with cerebral palsy and associated orthopedic disabilities. *Id.* at 1053. DCIU only offered early intervention services at the preschool and refused to pay the tuition. *Id.* at 1054. The court held that "for a student to be eligible under IDEA's definition of disability, and for DCIU to be responsible for fully funding a student's pre-school needs under IDEA, that student must be found to be in need of specially designed instruction." *Id.* at 1056. There was no evidence suggesting that he required specially designed instruction. *Id.* In so holding, the court noted that "[u]nder Pennsylvania law, while a student may be eligible for early intervention services . . . that eligibility does not *necessarily* require private pre-school attendance at public expense." *Id.* at 1058 (emphasis added). The court concluded that the Pennsylvania General Assembly intended "to exclude publicly funded private pre-school *in cases such as this one*, where a child's physical disabilities require some early intervention services, but a lack of cognitive disabilities negate the need for publicly funded pre-school attendance." *Id.* (emphasis added). As this qualifying language makes clear, *Jonathan S.* does not preclude public funding for a typical preschool where the preschool child has a cognitive impairment, like autism. On the contrary, it intimates that an LEA may have to fund a disabled child's placement in a typical preschool where circumstances require it.

Tuition reimbursement in unique situations is not new. Courts have recognized that "Congress contemplated a broad remedy when it gave reviewing courts the discretion to award 'appropriate' relief." *Bucks Cnty. Dep't of Mental Health/Mental Retardation v.*

*Pennsylvania*, 379 F.3d 61, 72 (3d Cir. 2004). The Third Circuit upheld a reimbursement award for the time a parent spent providing early intervention services to her own child after the county refused to provide therapy. *Id.* In doing so, the Third Circuit recognized that courts have the power to fashion remedies that are not specifically enumerated in the IDEA. *Id.* The court has also awarded compensatory services for students beyond the age of eligibility in Pennsylvania in certain circumstances. *See*, *e.g.*, *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 278 (3d Cir. 2014) (Noting "[i]n appropriate cases however, relief under the IDEA may be awarded beyond a student's twenty-first birthday" where plaintiff's age was unknown) (citations omitted); *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 718 (3d Cir. 2010) (granting non-monetary award of compensatory education to twenty-four year old student); *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990) (affirming district court's grant of 30 months of compensatory education to student beyond age 21). It has even awarded compensatory education for students who no longer reside in the school district if the circumstances warrant it. *See*, *e.g.*, *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497 (3d Cir. 2012). Given the willingness of courts to fashion remedies based on the child's unique circumstances, a court may grant tuition reimbursement for a typical preschool placement to address a child's specific needs and provide him FAPE.

States need not provide FAPE to children in the three-to-five age group where there is a state practice of not providing it. 20 U.S.C. § 1412(a)(1)(B)(i) (the obligation to make FAPE available to these age groups does not apply if it is "inconsistent with State

law *or* practice"). MCIU has presented no testimony or other evidence of state practice regarding tuition reimbursement for disabled children in typical preschools.[114]

Here, the only proffered evidence of state practice regarding tuition reimbursement comes from decisions of Pennsylvania Special Education Hearing Officers.[115] These decisions present no clear, consistent practice in Pennsylvania. On the contrary, they reveal a split among hearing officers, reinforcing the conclusion that there is none.

In *J.H. v. Bucks County Intermediate Unit*, the hearing officer held that BCIU was not required to provide J.H., a preschooler with autism, a typical preschool placement. ODR 01271/09-10 KE at 2 (Dec. 13, 2010). In so holding, she concluded that a child is entitled to receive FAPE in any of a wide range of settings, depending on the parents' choice, but the LEA does not have to fund that environment itself. *Id*. at 8. She held that "if the parents of a preschooler freely choose a typical preschool environment, there is no statutory obligation on the part of the LEA to purchase that environment with public funds. The LEA's sole obligation is to provide FAPE in that environment." *Id*. The same hearing officer reached the same conclusion in *S.F. v. Montgomery County Intermediate Unit,* ODR 2889/11-12AS at 23-26 (July 3, 2012).

In *L.B. v. Delaware County Intermediate Unit* and *J.D. v. Montgomery County Intermediate Unit*, the hearing officers held the parents were not entitled to tuition reimbursement for their children's placement at typical preschools because neither child

---

[114] Oral Arg. Tr. at 21:4-5.

[115] Although these decisions are not binding, they are persuasive and serve to illustrate the lack of Pennsylvania custom and practice. *See Batchelor*, 759 F.3d at 275 n. 11 (citations omitted) (considering decisions from Pennsylvania special education hearing officers that have addressed retaliation claims under the Rehabilitation Act to hold that plaintiffs must exhaust administrative remedies for retaliation claims related to the enforcement of rights under the IDEA).

required a private preschool placement to receive FAPE. ODR No. 1765/10-11-AS at 1 (July 22, 2011); ODR No. 01524-1011 AS at 2 (May 1, 2011).[116] The hearing officers in both cases noted that LEAs in Pennsylvania are generally not obligated to fund preschool classroom settings. *L.B.*, ODR Dec. at 4; *J.D.*, ODR Dec. at 9. In both cases, unlike in this case, nothing suggested that the students required a typical preschool placement to meet their developmental needs.[117] *L.B.*, ODR Dec. at 4-6; *J.D.*, ODR Dec. at 9.

In contrast, the hearing officer in *B.D. v. Montgomery County Intermediate Unit* held the parents of a five-year-old child with autism were entitled to tuition reimbursement for a typical preschool. ODR No. 00062-0910AS/00561-0910AS at 2 (May 8, 2010). According to the hearing officer, the evidence demonstrated a need for immersion in a typical preschool environment. *Id*. at 17-18. The hearing officer referenced a Pennsylvania Office of Child Development and Early Learning policy[118] that provides for placement in a typical community setting when it is necessary for the student to receive FAPE. *Id*. at 18. She stated that a policy against funding private typical preschool settings without "built in exceptions for the provision of FAPE" would contravene the IDEA. *Id*. In reaching her conclusion, the hearing officer stated the following about the relationship between the LRE and FAPE, specifically regarding autism:

> The behavioral, social and communication needs of the student as identified by the evaluations and the team and the interventions and supports engineered to address them are inextricably interwoven with and dependent

---

[116] J.D. had a speech and language impairment. ODR Dec. at 3. L.B. was diagnosed with Down Syndrome. ODR Dec. at 1.

[117] In *L.B.*, the hearing officer found the IU's services could be provided in a variety of settings, and many of the IEP's goals did not require a classroom. ODR Dec. at 4-6. In *J.D.*, none of the IU's evaluation reports or IEPs stated a need for a preschool program for either cognitive or social development, and the parents asserted no legal or factual basis for their claim that the IU should reimburse the costs of the typical preschool. ODR Dec. at 9.

[118] The parties did not cite this policy in their briefs in this case.

upon the stimulus, naturally occurring cues and naturalistic teaching opportunities occurring within the environment where services are delivered. Particularly with respect to the pervasive nature of the core deficits common to the diagnosis of autism, and most importantly with respect to the social skills interventions necessary to the future success of young children with this diagnosis, it is not possible to parse the 'service' from the framework in which they are provided. The provision of supportive services should not be viewed in a vacuum.

The fundamental core of each IEP goal promulgated by the team requires as a necessary component the availability of peers and activities promoting interaction with those peers. The need for adult supervision and facilitation (teachers) and a 'place' to conduct these activities (classroom) is obvious. Taken together, these components equal a pre-school setting. Failure to provide the pre-school setting is a failure of FAPE.

*Id*. In other words, according to the hearing officer in *B.D.*, LEAs in Pennsylvania are not obligated to fund private preschool for all disabled children, but they may be if it is necessary in an individual case to provide FAPE for a particular disabled child. *Id*. at 18-19.

There is no consensus on the obligation of an LEA to pay tuition for a typical preschool placement. On one hand, the hearing officer in *J.H.* and *S.F.* concluded that public funding of a typical preschool placement was not an option in Pennsylvania. On the other hand, the hearing officer in *B.D.* concluded that the typical preschool was integral for the child to receive FAPE, obligating the IU to fund it. In *L.B.* and *J.D.*, the hearing officers concluded a typical preschool setting was not required on the facts of those cases, suggesting that tuition reimbursement is not precluded when necessary to provide FAPE.

Rather than demonstrating a consistent state practice of not providing tuition reimbursement for placements at typical preschools, these decisions intimate that there is a practice in favor of it. MCIU has presented no other evidence of Pennsylvania's

practice regarding tuition reimbursement. Absent a state practice clearly foreclosing public funding of typical preschools for disabled children when necessary for FAPE, we cannot conclude that Pennsylvania has clearly opted out of the IDEA's FAPE requirements for preschoolers. Indeed, providing FAPE to disabled preschool students is consistent with Pennsylvania's policy as expressed in the PDE Policies and Procedures.

We hold that in the particular circumstances of this case, MCIU must reimburse Parents for K.S.'s placement at Hearts and Hands. To be clear, we do not hold that every preschool student with special needs is entitled to a typical preschool placement. Not every student with special needs requires placement at a typical preschool to receive FAPE. Only where, as here, it is clearly established that the disabled child requires placement in a typical preschool to receive FAPE is the LEA responsible for tuition.

*Transportation*

Under the IDEA, LEAs must provide eligible children with FAPE and appropriate "related services" in the LRE. 20 U.S.C. § 1400(d)(1)(A). Section 1401 provides that "[t]he term 'related services' means transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). Transportation is defined as including: "(i) Travel to and from school and between schools; (ii) Travel in and around school buildings; and (iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability." 34 C.F.R. § 300.34(c)(16).

Section 875-103 of the EISSA does not discuss transportation. But, it clarifies that the early intervention services are "not limited" to the services listed in its definitions. 11

P.S. § 875-103. Section 13-1374 of Purdon's Pennsylvania Statutes explicitly provides that:

> Any exceptional child . . . who is enrolled in a regular class in which approved educational provisions are made for him, may be furnished with free transportation by the school district. . . . If free transportation . . . is not furnished for any exceptional child or any eligible young child as defined in the [EISSA] who, by reason thereof, is unable to attend the class or center for which he is qualified, the intermediate unit shall provide the transportation necessary.

24 P.S. § 13-1374.

Because placement at the typical preschool is appropriate for K.S. to receive FAPE, K.S. is qualified for the typical preschool. Given that K.S. is an eligible young child under the EISSA and is qualified for Hearts and Hands, Section 13-1374 mandates that MCIU provide K.S. with transportation.

As with our holding covering tuition, MCIU's obligation to provide transportation to a typical preschool is limited to the specific circumstances of this case. K.S. requires placement at a typical preschool due to the unique circumstances of his autism diagnosis and his educational needs. Under Pennsylvania law, K.S. is entitled to receive transportation to his typical preschool.

## Conclusion

The IDEA standards and Pennsylvania statutes, regulations and policy documents demonstrate that tuition reimbursement for a private typical preschool placement is appropriate in K.S.'s circumstances because that educational environment is necessary to provide FAPE. Additionally, MCIU must transport K.S., as an eligible young child under the EISSA, to his placement at Hearts and Hands. Therefore, we shall grant Parents' motion for judgment on the administrative record and deny MCIU's cross-motion.